# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs December 9, 2014

## STATE OF TENNESSEE v. JAMES HENRY ALLEN

**Appeal from the Criminal Court for Washington County**
No. 36557    Robert E. Cupp, Judge

**No. E2014-00529-CCA-R3-CD - Filed January 23, 2015**

Defendant, James Henry Allen, was indicted by the Washington County Grand Jury for premeditated first degree murder, unlawful possession of a deadly weapon with the intent to employ it in the commission of a first degree murder, and a violation of an order of protection in connection with the murder of his ex-wife's cohabiting boyfriend. During trial, the trial court dismissed the charge related to a violation of an order of protection. Defendant was convicted by a jury of first degree murder and unlawful possession of a deadly weapon with the intent to employ it in the commission of a first degree murder. As a result, he was sentenced to an effective life sentence with the possibility of parole. He appeals, challenging the admission into evidence of his statement to the police, the 911 tape, and the damaged trailer door, as well as the sufficiency of the evidence. After a thorough review of the record and applicable authorities, we determine: (1) the trial court properly admitted Defendant's statement into evidence where there was no requirement that it be recorded; (2) the trial court properly admitted the 911 tape into evidence as an excited utterance and to rebut Defendant's assertion that shots were fired from inside the trailer; (3) the trial court properly admitted the trailer door into evidence where there was ample secondary evidence to support the conclusion that the shots were fired from outside the trailer; and (4) the evidence was sufficient to support the conviction for first degree murder. As a result, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ALAN E. GLENN, J., joined.

Jeff Kelly, District Public Defender; William L. Francisco and William Donaldson, Assistant Public Defenders (at trial); and Steve McEwen, Mountain City, Tennessee (on appeal), for

the appellant, James Henry Allen.

Herbert H. Slatery, III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Anthony Clark, District Attorney General; and Dennis Brooks, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Factual Background*

Deborah Kay Franklin Keplinger[1] married Defendant on March 18, 1985. The couple divorced in September of 1994 after approximately nine-and-a-half years of marriage. The couple have three children together. The divorce did not signify the end of their relationship; the parties still lived together "on and off" in what Mrs. Keplinger characterized as an "up and down" relationship. During the marriage, they lived in a double-wide trailer on Cherry Lane in Fall Branch, Tennessee.

Mrs. Keplinger started dating Richard Carter, the victim, in December of 2009. At that time, she did not have a relationship with Defendant. In fact, Mrs. Keplinger never told Defendant that she was in a relationship with the victim. However, Defendant eventually found out about the relationship. He expressed his disapproval about Mrs. Keplinger's relationship with the victim to at least one of the couple's daughters.

On several occasions, Defendant made disparaging comments about Mrs. Keplinger, the victim, and Mrs. Keplinger's father. Defendant repeatedly sent text messages to Mrs. Keplinger which she described as threatening. But once, Defendant also sent her a text message wishing her happiness.

Eventually, in an attempt to stop Defendant from communicating with her, Mrs. Keplinger got an order of protection against Defendant. After the trial court entered the order of protection, Mrs. Keplinger still received text messages from Defendant. He would also try to "send messages through [their] daughter" and "stay across the street at [Mrs. Keplinger's] neighbor's house and holler things out at [her] and [her] dad." Mrs. Keplinger reported Defendant's behavior to the police on several occasions after he made "threats"

---

[1]Mrs. Keplinger has since remarried. Throughout the transcript and technical record, she is referred to as Deborah Allen, Debbie Allen, and Debbie Keplinger. For the sake of clarity, we will refer to her as Mrs. Keplinger throughout this opinion.

toward her and the victim.

On one occasion in particular, Defendant was "making a mockery of [her] dad and stuff and hollering things across the yard." Mrs. Keplinger described it as the "final straw" because she had called 911 several times and had gotten "no response" from the police. As a result of this particular incident, Defendant was arrested for violating the order of protection on March 2, 2010.

After Defendant was arrested, he still made threats to Mrs. Keplinger. Defendant would also tell their oldest daughter that he "was going to kill [Mrs. Keplinger] and [the victim] and threatened [their] lives." Mrs. Keplinger called 911 every time Defendant made threats.

Mrs. Keplinger and the victim lived together at the residence on Cherry Lane. This was the same residence that Defendant and Mrs. Keplinger lived in during their marriage. On the evening of May 10, 2010, Mrs. Keplinger and the victim were at home after work. The victim and Mrs. Keplinger went to Fall Branch early that evening to visit the victim's sister and her husband. The victim was working on a vehicle that belonged to Mrs. Keplinger and wanted to ask them a few questions about the work he was performing. They arrived back at the Cherry Lane residence around 9:30 p.m.

Mrs. Keplinger went to the kitchen to clean up; she also prepared some leftovers of a pot roast for the victim to eat. After the victim ate the leftover roast, he "went to the bathroom to shave and to take his shower before bed." Mrs. Keplinger noticed that both her "outside" dog and "inside" dog, Peaches, were barking. She let Peaches outside. At that point Mrs. Keplinger,

> stepped out on the porch to look around to see what it might be that [Peaches] was barking at. And [she] stepped back inside to flip the light switch on and it wouldn't come on and that's when [she] looked up and — and [she] said didn't [they] just change this light bulb. That's when [she] hollered at [the victim] and he c[a]me and [she] said didn't [they] just change this light bulb. He said yeah. And that's when [they] found out that it had —it had been broken and it was no[ ] longer there.

Mrs. Keplinger walked back into the house to ask the victim about the light bulb. The victim walked to the front door, flipped the switch up and down, and looked at the outside light fixture, confirming that the bulb was missing. Mrs. Keplinger walked to the kitchen to get a new bulb. The victim closed the door and looked out through the small, diamond shaped window in the door. At that point, Mrs. Keplinger heard what sounded like

"fireworks" and "popping sounds" coming from outside the home. Mrs. Keplinger realized that they were gunshots but could not tell from what direction the shots were coming. She heard four or five pops all in a row. When she ran to the front door, the glass in the front door was shattered. Mrs. Keplinger ran to the victim who was still standing near the front door; he stated that he had been shot. The victim fell toward Mrs. Keplinger to the floor.

Mrs. Keplinger ran back to the bedroom, picked up her phone, and dialed 911. She tended to the victim by getting a towel for under his head. The victim was lying on his stomach. She could not see any injuries but the victim had "a little bit of puke coming out of his mouth" that she wiped off with a towel. The victim was semi-responsive at this point, moaning in pain. Medical personnel and police arrived. The victim was transported to the hospital but ultimately died as a result of the gunshot wounds.

After a police investigation, Defendant was indicted by the Washington County Grand Jury for premeditated first degree murder, unlawful possession of a deadly weapon with the intent to employ it in the commission of a first degree murder, and a violation of an order of protection[2] in connection with the murder of his ex-wife's cohabiting boyfriend.

*Motion to Suppress*

Prior to trial, Defendant filed a motion to suppress his statement. The trial court held a suppression hearing on the admissibility of Defendant's statement to police. Investigator Jeff Miller of the Washington County Sheriff's Department testified at the hearing. He interviewed and took a written statement from Defendant on May 14, 2010, after Defendant was identified as a suspect in a "shooting" in Fall Branch at the home of Defendant's ex-wife.

Investigator Jeff Miller explained that the police had a difficult time locating Defendant until they were notified by Defendant's "kinfolks" that he had called someone in the family. The next morning, Investigator Miller received a call from Defendant's daughter, Leslie Nelson. She relayed to officers that she had spoken with Defendant on the phone. During the conversation with Mrs. Nelson, Defendant expressed his desire to turn himself in to police. He also threatened to shoot himself. Police eventually reached Defendant on the phone. Defendant claimed that he was cold, hungry, and wanted to turn himself in to the police. Defendant was apprehended by a SWAT team in a rural area. At the time, he was in possession of a pistol, several books, several bottles of prescription medication, and a Mountain Dew soft drink. Defendant was taken to police headquarters for questioning.

---

[2]Count Three of the indictment charging Defendant with a violation of an order of protection was dismissed during trial.

-4-

On the way to the police station, Defendant was given a foot-long sandwich from Subway, a granola bar, and something to drink. He was given *Miranda* warnings by Sergeant Sam Phillips before he gave a statement. Investigator Miller took thirteen pages of notes while Defendant was questioned about the events leading up to the victim's death. The statement was reduced to writing by Investigator Miller and signed by Defendant. The statement was not recorded.

Defendant testified at the hearing on the motion to suppress. He claimed that he was not given *Miranda* warnings. He stated that it did not look like his signature on the form because his signature "is always different every time [he] sign[s] it." Defendant stated that it was a forged signature on the *Miranda* form but acknowledged that it was his signature on at least page one of the three page statement. He was "not for sure" if it was his signature on the remaining pages.

At the conclusion of the hearing on the motion to suppress, the trial court found there "was absolutely no difference in those four signatures" and that Defendant was "not being truthful . . . when he [said] he didn't sign that." The trial court denied the motion to suppress.

*Trial Testimony*

At trial, the State presented the testimony of Officer Roger Conkin of the Washington County Sheriff's Office. He responded to a call about a shooting on Cherry Lane in Fall Branch on May 12, 2010. Mrs. Keplinger called 911 to request an ambulance and to report the shooting. The 911 call was admitted into evidence over objection by counsel for Defendant. During the call, Mrs. Keplinger was often hysterical, stating more than once that it was probably her "ex" that was responsible for the shooting. On the tape, she can be heard crying, begging, and pleading for help. She gave the 911 dispatcher Defendant's name, a description of his vehicle, and the location of his residence.

As Officer Conkin and Deputy Dwayne Cowan entered the residence, they noticed the victim "laying in the floor in front of the door—front door, had some [gunshot] wounds to the chest area." The only other occupant of the residence was Mrs. Keplinger. Deputy Cowan described Mrs. Keplinger as "hysterical," "panicked," and "scared." Deputy Cowan stated that Mrs. Keplinger kept repeating that she "thought it was her ex-husband due to him making threats [that] he would kill her."

Officers noticed that it was dark outside the residence and discovered that the porch light was not working. Officers got a lightbulb and "put it in the porch light" so that they could see to secure the scene.

The victim was taken away by emergency medical personnel but died as a result of his injuries. Dr. Teresa Allen Campbell, a forensic pathologist, testified as an expert. She performed the autopsy on the victim. At trial, she explained that the victim suffered a gunshot wound, Wound "B", to the "left/lower neck/upper chest" that caused injury to major blood vessels and vital organs which resulted in bleeding and, ultimately, death. There were a total of three wounds. Wound "A" was from a "round, flat gray-colored piece of metal that had white paint on it." Wound "C" was also caused by a "round, flat piece of gray metal with white paint on it." There was mild stippling around the wounds that was not caused by gunpowder but probably by "debris" or "splinters." One bullet was recovered from the victim's body.

Investigator Miller was the lead investigator on the case. Investigator Nikki Salyer of the Washington County Sheriff's Department assisted in processing the scene and taking photographs of the evidence. A total of five "spent rounds" were located outside the residence near a vehicle.

Defendant was located after his daughter, Jamie, called 911. Jamie had spoken to Defendant and reported that he was in the area near Fall Branch. Sergeant Phillips testified that he made contact with Defendant on a cell phone. Sergeant Phillips explained to Defendant that they wanted to talk to him about what happened to the victim. Defendant was on foot and was unable to explain his exact location to officers but officers were eventually able to locate him based on the description of the area in which he was standing. Officers instructed Defendant to place his gun down on the road and stand "thirty to forty" yards away from it while waiting on the officers to arrive.

When officers arrived, Defendant was standing in the road. A pistol, a soft drink, and several books were lying in the road nearby. The gun was loaded with eight rounds. Defendant was also in possession of various bottles of prescription medication. Defendant was able to take officers to a heavily wooded location nearby where a rifle, box of ammunition, and a pack of cigarettes were recovered. Defendant was taken to police headquarters where he gave a statement. The recording equipment in the room was not working properly, so the interview was not recorded. Instead, Investigator Miller took notes while Defendant was being questioned. These notes were reduced to a formal statement and signed by Defendant. Defendant's statement was admitted into evidence. It reads as follows:

> I have lost 2 familys [sic] over the past 30 years. I worked on the property at 175 Cherry Lane for over a year blasting rock to put my mobile on. Me and Debbie at that time were divorced but we lived together anyway. We put a mobile home in and we moved in. Later on Debbie would flat[t]en my tires to keep me a[t] home to be with her and make love and be together. Then she

-6-

would go to work and tell me to stay at home and don't have any women in the house. She accused me of being with the mail lady and everybody else. She was a very jealous woman. She had met Rick at her work place when he was married. Rick got divorced and started seeing her at her workplace in Jonesborough. I found out that she was seeing Rick and she had an order of protection served on me and I moved across the street to 176 Cherry Ln. to my friends Tom and Dawn Blair's. After that she moved Rick into our mobile home. He was using my couch and bed and that made me angry. My youngest daughter Jamie was having trouble with her boyfriend and I went to her workplace and told her that she could go to her mom[']s, that I would take her to get her stuff. She told me that she didn't like going to her mom[']s because of the way Rick looked at her or the way he looked. That made me that much more angry. About a week or so ago my grandson who is 4 years old suppos[ed]ly fell off the sliding board at the park and shattered his arm. I don't know if she jerked his arm to get back at me and everybody because of her rages and the fact that he looks just like me. Debbie even thought that he might even be my kid and had a DNA test done. After being with Debbie for 26 years and seeing Rick hug her was making me angry. I felt like I had lost my second family at this point. It made me snap. It was like a dream. I went up to th[e] house to the right of the mobile home and got a rifle that was hid in the house after I saw them hugging in the window. I went and was petting my dog. I didn't want to be seen so I unscrewed the light bulb and put it in my pocket. I went back to petting my dog and Peaches the inside dog started barking and Debbie came to the door and let the dog out and said something about the light not working. She shut the door and Rick came to the door and put his face in the window. My son and daughter had told me that Rick had been carrying a gun. I shot a warning shot or 2 in the air. In the door window it looked as if Rick was pulling a gun up and I shot a few shots through the door to scare him. I started walking down Cherry Lane towards [H]ighway 93. I crossed 93 and across the bridge behind the barn. I passed out for about an hour because I was tired. After I woke up I thought that I had dreamed it all. I got a phone call from Jerry Arnold my nephew and he said that Debbie's boyfriend had got shot and I saw the rifle lying there and I figured it was true. I walked into the woods and set up some snares. I shot me a rabbit to eat and went to sleep. I had planned to stay in the woods a couple of days to mellow me out. I hadn't been over there in 6 weeks. I don't know why I went over there. As I was walking up Cherry Lane initially, I could see through the rear sliding door where the pool table was and I could see them hugging. That really made me snap. After spending the night in the woods my daughter called me and I didn't know if I had dreamed it and she told me that Rick was

dead. I told her that I wanted to turn myself into the Sheriff's office because I was sick and needed help. The next call came from the S[ergeant] with the Sheriff's office wanting to meet me. I arranged to meet them, and they showed up. My sugar is up and down and messing with me. I believe that[']s why I was there.

As part of the investigation, Detective Dabney Kirk, a special agent with the Tennessee Bureau of Investigation, tested the pistol and rifle for fingerprints. At trial, Detective Kirk testified as an expert in the field of latent print examination. She explained that there were no prints recovered from the handgun or rifle.

Agent Steve Scott of the Tennessee Bureau of Investigation ("TBI") testified as an expert in firearms identification and trajectory analysis. He examined a .22 caliber Phoenix Arms automatic pistol, a box of .22 caliber ammunition manufactured by the CCI Corporation, bullets recovered from the ceiling and wall at the crime scene, and a Savage/Stevens rifle without a shoulder stock. The pistol was recovered from Defendant when he was arrested; the rifle was recovered after Defendant showed officers where he had it hidden in the woods. Agent Scott was able to conclusively determine that the bullet from the ceiling was fired through the rifle. The bullet from the wall was "a little more damaged just from impact and has a lot of the same characteristics but not quite enough for me to conclusively match it." In other words, the results of the testing with regard to whether the bullet from the wall was fired through the rifle were inconclusive.

The trailer door was admitted into evidence over the objection of Defendant. With respect to the trailer door, there was testimony from investigating officers that there was no glass collected from the scene. Additionally, the trailer door was not sent to the TBI lab. It was introduced into evidence during the testimony of Sergeant Sam Phillips. He explained that in transit from the residence to the Sheriff's office, the door fell down and some of the glass fell out.

Agent Scott also examined the trailer door from the residence on Cherry Lane. He did not examine the door at his lab but examined the door in the courtroom prior to his testimony. He determined from looking at the door that there was "evidence [consistent with] six different gunshots, bullets, passing through the door" from "outside to inside." He explained that when a bullet "enters a pane of glass" the glass will "bend slightly prior to beginning to break, and the area that the bullet actually touches, . . . will be somewhat pulverized and continues to be pushed through the rest of the pane of glass." A bullet generally leaves a "fairly clean cut hole" where it "penetrated the glass." On the back side, the bullet forms a "crater around the hole that it creates as it continues through the glass."

Defendant called one witness, his daughter, Jamie Allen. She testified that Defendant threatened to kill himself on at least one occasion. She also testified that she never heard him threaten to kill Mrs. Keplinger or the victim. Ms. Allen talked to Defendant on the night of the incident. She described him as sounding "confused" and stated that he was "speaking slower than normal." Defendant was not sure where he was and told Ms. Allen that he saw "lights in a distance." She instructed him to try to get to a place he might recognize; Defendant told her that he was "tired" and that "he needed to rest and lay down." Defendant called back the next morning, claiming that he could see an "old neighbor's house." At that time, Ms. Allen contacted her sister and told her to call the police. As explained previously, this series of telephone calls led to Defendant's arrest.

At the conclusion of the trial, Defendant was convicted as charged in the indictment. As a result, Defendant was sentenced to life imprisonment with the possibility of parole for the first degree murder conviction and to one year as a Range I, standard offender for the possession of a deadly weapon conviction, to be served concurrently with the life sentence.

After the denial of a motion for new trial, Defendant appeals. The following issues are presented for our review on appeal: (1) whether the trial court erred in admitting Defendant's statement when it was not recorded; (2) whether the trial court erred in admitting the recording of the 911 call as an excited utterance; (3) whether the trial court erred in admitting the trailer door when the State did not properly preserve the evidence; and (4) whether the evidence is sufficient to support the conviction for first degree murder.

*Analysis*

*Admission of Defendant's Statement*

Defendant complains on appeal that his statement was improperly admitted. Specifically, he argues that the statement was inadmissible because the interview was not recorded. Failure to record the interview, in his view, was a violation of due process. The State argues that Defendant waived this issue for failure to include it in a pretrial motion to suppress as required by Tennessee Rule of Criminal Procedure 12(b)(2)(c). Additionally, the State notes that Tennessee law does not require the recording of interrogations and, therefore, Defendant is not entitled to relief.

A motion to suppress evidence must be made prior to trial, and failure to do so results in waiver. Tenn. R. Crim. P. 12(b)(2)(C), 12(f)(1). Such a motion must state with particularity the grounds upon which relief is sought. Tenn. R. Crim. P. 47(c)(1); *State v. Jefferson*, 938 S.W.2d 1, 9 (Tenn. Crim. App. 1996) (noting that motions containing "bare allegations of law" rather than factual allegations may not be entitled to hearing); *State v.*

*Bell*, 832 S.W.2d 583, 588-89 (Tenn. Crim. App. 1991).

Tennessee Rule of Appellate Procedure 36 allows an appellate court to grant relief to which a party is entitled, but does not require that relief "be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a). This reflects "the accepted principle that a party is not entitled to relief if the party invited error, waived an error, or failed to take whatever steps were reasonably available to cure an error." Tenn. R. App. P. 36(a), Advisory Comm'n Cmt.

Here, Defendant filed a pretrial motion to suppress his statement on the basis that he was not properly given *Miranda* warnings. At the hearing, the testimony focused primarily on the events leading up to Defendant's arrest and his subsequent interrogation. At one point during the hearing, counsel for Defendant asked Investigator Miller if the statement was recorded and inquired as to whether recording equipment was available. Investigator Miller informed counsel that the recording equipment was not functioning properly and, therefore, was not utilized during Defendant's questioning. The testimony from Defendant focused on whether he was properly given *Miranda* warnings and whether it was actually his signature on the written statement. Counsel for Defendant did not amend the motion to suppress to include a challenge to the statement based on the lack of a recording and did not argue this ground at the hearing on the motion. The failure to raise this issue with particularity in a motion to suppress prior to trial or at the hearing results in waiver. Tenn. R. Crim. P. 12(b)(2)(C).

At trial, Defendant again challenged the admissibility of the statement. During the testimony of Investigator Miller, when the State sought to introduce the statement of Defendant, counsel for Defendant objected to the introduction of the written statement on the basis that it was not the "best evidence." Counsel argued that the best evidence of the statement would be a recording. Counsel stated that he was "objecting to the fact that [the statement] wasn't recorded." The trial court overruled the objection, stating that there was "nothing in Tennessee law that says it has to be [recorded]." We view Defendant's challenge in part as a challenge to the admissibility of the statement into evidence at trial.

Generally, we review the admissibility of evidence with an abuse of discretion standard, meaning that admissibility of evidence is within the sound discretion of the trial court, and this Court will not interfere with the exercise of that discretion in the absence of a clear showing of abuse appearing on the face of the record. *See State v. Barry D. McCoy*, No. M2013-00912-SC-R11-CD, ___ S.W.3d ___, 2014 WL 6725695, at *5 (Tenn. Dec. 1, 2014); *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993). An abuse of discretion occurs when the trial court (1) applies an

incorrect legal standard; (2) reaches an illogical or unreasonable decision; or (3) bases its decision on a clearly erroneous assessment of the evidence. *State v. Mangrum*, 403 S.W.3d 152, 166 (Tenn. 2013) (citing *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)).

Defendant readily admits that there is no authority in Tennessee requiring interrogations to be electronically recorded. Instead, he invites the Tennessee Supreme Court to exercise its plenary powers to serve the "administration of justice" by requiring the recording of custodial interrogations. In *State v. Godsey*, 60 S.W.3d 759, 771-72 (Tenn. 2001), the supreme court declined such an invitation, noting:

> [N]either the state nor the federal constitution requires electronic recording of interrogations. We have found at least fifteen other states that have declined to impose such a requirement when faced with the issue. *See* Daniel Donovan & John Rhodes, *Comes a Time: The Case for Recording Interrogations*, 61 Mont. L. Rev. 223, 232, n.52 (Winter 2000). There can be little doubt that electronically recording custodial interrogations would reduce the amount of time spent in court resolving disputes over what occurred during the interrogation. As a result, the judiciary would be relieved of much of the burden of resolving these disputes. In light of the slight inconvenience and expense associated with electronically recording custodial interrogations, sound policy considerations support its adoption as a law enforcement practice. However, "[t]he determination of public policy is primarily a function of the legislature." *Griffin v. Shelter Mut. Ins. Co.*, 18 S.W.3d 195, 200-01 (Tenn. 2000). As we commented in *State v. Odom*, 928 S.W.2d 18, 23-24 (Tenn. 1996), the issue of electronically recording custodial interrogations "is one more properly directed to the General Assembly." *Id.* The defendant's claim that his statement should have been suppressed because it was not electronically recorded is without merit.

(internal footnote omitted).

Therefore, without a showing by Defendant that the trial court applied an incorrect legal standard, reached an illogical or unreasonable decision, or based its decision on a clearly erroneous assessment of the evidence, we determine that the trial court did not abuse its discretion in admitting the written statement. *Mangrum*, 403 S.W.3d at 166. Defendant was questioned by officers about his involvement in the shooting death of the victim. Investigator Miller took nearly thirteen pages of notes during the interview. These notes were reduced to a written statement at the conclusion of the interrogation. The statement was signed by Defendant. The trial court did not abuse its discretion in admitting the statement. Defendant is not entitled to relief on this issue.

*Admission of 911 Tape*

Next, Defendant takes issue with the admission of the 911 tape during which Mrs. Keplinger reported the shooting of the victim. Defendant insists that the "emotional" call, during which Mrs. Keplinger was "understandably panicked and distraught," was more prejudicial than probative and that its admission constitutes reversible error. Additionally, Defendant argues that the tape was cumulative evidence because Mrs. Keplinger had already testified to the events and to her belief that Defendant was the shooter. The State disagrees.

At trial, during the cross-examination of Deputy Conkin, counsel for Defendant asked if officers ever considered Mrs. Keplinger a suspect in the murder of the victim. Deputy Conkin replied that Mrs. Keplinger was not considered a suspect because "she made the call to 911 and it was her boyfriend that was shot." Counsel for Defendant then asked the deputy if he had ever "responded to domestic calls between boyfriend and girlfriend." He replied in the affirmative. Counsel for the Defendant asked if there was "any other reason that [Mrs. Keplinger] was never considered . . . a suspect." The State objected and the trial court sustained the objection.

Next, during the cross-examination of Officer Cowan, counsel for the Defendant asked if officers searched the trailer for "a weapon that could have been used." Officer Cowan stated that he was "looking for a man holding a weapon" but never actually searched the trailer for a weapon.

During the direct testimony of Investigator Miller, the State sought to introduce the 911 tape wherein Mrs. Keplinger called to report the shooting and suggested that Defendant was the shooter. In a bench hearing, counsel for Defendant argued the following:

> This is a 911 call from [Mrs. Keplinger] that night. She's already testified. [Counsel for the State] has (indiscernible) for - - he believes that we have created some inference that there was a gun fight out there. She's already been asked, obviously, whether there were any other weapons. There's no reason to play this other than to give a prejudicial effect. I mean, there's - - you can imagine there's lots of screaming.

Counsel for the State insisted that it was an excited utterance and that it "greatly corroborates her testimony . . . that he was at the door and she thinks her [ex-husband] might have done it." In other words, the tape rebuts the Defendant's assertion that the shots could have come from inside the trailer. The trial court reviewed the tape and determined that Defendant was objecting to the 911 tape as prejudicial hearsay. The trial court noted that Defendant brought up the inference that shots could have come from inside the trailer and determined it was

"admissible for . . . under the excited utterance [exception to the hearsay rule] to show her state of mind at that point."

The tape was then played for the jury.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence is generally admissible. Tenn. R. Evid. 402. However, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of delay, waste of time, or needless presentation of cumulative evidence. Tenn. R. Evid. 403. As noted above, we review the admissibility of evidence with an abuse of discretion standard. *DuBose*, 953 S.W.2d at 652; *Van Tran*, 864 S.W.2d at 477.

Here, the trial court admitted the 911 recordings under the excited utterance exception to the hearsay rule and to show Mrs. Keplinger's state of mind at the time of the shooting. Pursuant to Rule of Evidence 803(2), the hearsay rule does not exclude "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Tenn. R. Evid. 803(2). "Underlying the excited utterance exception is the theory that 'circumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication.'" *State v. Franklin*, 308 S.W.3d 799, 823 (Tenn. 2010) (quoting *State v. Land*, 34 S.W.3d 516, 528 (Tenn. Crim. App. 2000)). Three requirements must be met for a statement to qualify as an excited utterance:

> The first requirement is a startling event or condition that suspends the normal, reflective thought processes of the declarant. Second, the statement must relate to the startling event or condition. This broad requirement offers considerable leeway such that the statement may describe all or part of the event or condition, or deal with the effect or impact of that event or condition. The third and final requirement dictates that the declarant make the statement while under the stress or excitement from the event or condition. This requirement considers a variety of factors, including the interval of time between the startling event and the statement.

*Id.* (footnotes, citations, and internal quotation marks omitted). The excited utterance exception also has a competency requirement where "the declarant must have had an opportunity to observe the facts contained in the extrajudicial statement." *Land*, 34 S.W.3d at 529. The "'ultimate test'" of whether a statement is admissible within the excited

utterance exception is "'spontaneity and logical relation to the main event and where an act or declaration springs out of the transaction while the parties are still laboring under the excitement or strain of the circumstances and at a time so near it as to preclude the idea of deliberation and fabrication.'" *Franklin*, 308 S.W.3d at 823 (quoting *State v. Smith*, 857 S.W.2d 1, 9 (Tenn. 1993)).

In this case, we conclude that the 911 call fits squarely within the requirements of the excited utterance exception. Mrs. Keplinger spontaneously reported the shooting during the call and described the startling event immediately after it occurred, while still under the stress of the event. On the tape, Mrs. Keplinger sounds extremely distressed and is heard hysterically crying and audibly sobbing. At different times during the approximately thirteen minute tape, Mrs. Keplinger can be heard crying and pleading for emergency assistance. She exclaims to the 911 operator that "someone just shot my boyfriend"; "I think it was my ex"; "It's gotta be my ex husband"; "please hurry"; and "please, baby please." She states that the victim was "shot through the door." Mrs. Keplinger provided a description of Defendant's car and gave the location of his last known residence. Her statements during the tape are consistent with the account of the events she relayed to the officers who arrived on the scene and her testimony at trial. Mrs. Keplinger's audible distress on the tape coupled with the short interval from the time the event occurred and the strain of the event belie the opportunity for the fabrication of her allegations. Under these circumstances, the trial court properly admitted the 911 recordings as an excited utterance.

Defendant cites *State v. James D. Beaird*, No. M2006-01931-CCA-R3-CD, 2008 WL 425923 (Tenn. Crim. App. Feb. 15, 2008), *perm. app. denied* (Tenn. Aug. 25, 2008), to support his argument that the trial court erred in admitting the 911 tape as an excited utterance. In *James D. Beaird*, the victim was shot and killed outside of his home. *Id.* at *1. The victim's mother heard the victim leave the house, then heard gunshots. When she ran to the window, she saw the defendant with the victim, "shooting at the ground." *Id.* She ran outside, asking the defendant why he was shooting at her son. The defendant threatened her. She and the victim were forced inside at gunpoint, followed by the defendant. The victim pushed his mother into the den and closed the door. A gunshot was heard before the victim was seen "gasping for breath." *Id.* The mother called 911.

In *James D. Beaird*, the 911 tape was admitted after the trial court explained that the identification of the perpetrator was a "key issue" and that the tape gave the jury "insight" about the mental and emotional state of the victim's mother. *Id.* at *9. On appeal, the defendant argued that the tape was irrelevant and/or overly prejudicial. This Court determined that the admission of the tape as an excited utterance was not relevant, "given that the information on the tape had already been imparted through the testimony of the state's witness." In fact, this Court ruled that the tape was "marginally probative of the

-14-

defendant's identity" and "prejudicial as it contained emotional outpourings of the victim's mother in the aftermath of a violent crime." Additionally, the tape was deemed cumulative to the live testimony. *Id.* at *10. Thus, we determined that the trial court erred in admitting the tape into evidence. However, this Court deemed the error harmless based on the fact that the evidence clearly established the defendant as the perpetrator and that the trial court properly instructed the jury. *Id.*

We determine that *James D. Beaird* is distinguishable from the case herein. The admission of the 911 tape herein was not part of the testimony of Mrs. Keplinger. In this case, it was Defendant who raised the inference that shots came from within the trailer. Counsel for Defendant questioned several of the officers about whether Mrs. Keplinger was ever considered a suspect; whether the residence was searched for weapons; and whether it appeared from the physical evidence that the shots were fired from inside or outside of the trailer. The State introduced the 911 tape only to corroborate Mrs. Keplinger's testimony.

"[E]ven if evidence is inadmissible, a party may 'open the door' to admission of that evidence. A party opens the door to evidence when that party 'introduces evidence or takes some action that makes admissible evidence that would have previously been inadmissible.'" *State v. Gomez*, 367 S.W.3d 237, 246 (Tenn. 2012) (quoting 21 Charles Alan Wright et al., *Federal Practice & Procedure Evidence* § 5039 (2d ed.1987)). We determine that when Defendant raised the inference that the shots that killed the victim could have come from inside the trailer, he opened the door to the admissibility of the 911 tape irrespective of its admissibility as cumulative evidence at that point in the trial.

Therefore, we determine that not only did the trial court properly admit the 911 tape as an excited utterance, but that the Defendant also opened the door to the admissibility of the evidence by suggesting that Mrs. Keplinger or someone from inside the trailer fired shots. The tape corroborates her credibility regarding her trial testimony that there was no one shooting from inside the trailer. The tape also refuted Defendant's assertion as it showed Mrs. Keplinger's obvious distress over the situation and her spontaneous statement that Defendant was responsible for the shooting. Defendant is not entitled to relief on this issue.

*Preservation of Trailer Door as Evidence*

Defendant complains on appeal that the State failed to properly preserve the glass in the trailer door. Specifically, he notes that prior to trial he filed a motion to preserve the evidence due to the fact that he raised the possibility that some of the shots came from inside the trailer. Despite the filing of the motion, the glass in the door was damaged while transported by the Sheriff's department. As a result, Defendant argues that the admission of the damaged trailer door into evidence was error, deprived him of a fundamentally fair trial,

and violated his due process rights as outlined in *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999). The State counters that the "contention is meritless because the significance of the destroyed evidence was minimal in light of the probative value and reliability of substitute evidence and the overwhelming weight of the other evidence."

During the trial, as noted above, Defendant raised the allegation that some of the shots could have come from inside the trailer. After the testimony of the firearms expert, Agent Scott, counsel for the State requested that the agent take a look at the trailer door.[3] Counsel for the State informed the trial court that the "window [on the door] is not intact like it was in the pictures because of its fragile state in transporting it from there to here, getting it off the door hinges and stuff. Apparently at some point . . . most of the glass [was] busted out." Counsel went on to explain that a portion of the glass still remained in the door "where the bullet passed through." During a jury out hearing, counsel for the State sought to recall Agent Scott to testify as to his opinion about the origin of the gunshots—whether they were from outside the trailer or inside the trailer. Counsel for Defendant objected to the admissibility of the door on the basis that Defendant had filed a motion to preserve the evidence and the State failed to preserve the door properly. The trial court noted that it was "troublesome" that the door was not preserved but found it important that Defendant raised the issue that the shots could have come from inside the trailer. Further, the trial court commented that it would be unfair for the State to be unable to counter that argument with the entry of the door. The trial court informed Defendant that he had every opportunity to examine the door prior to trial and get their own expert and Defendant "simply didn't look at this evidence [prior to trial]." The trial court found that the "door should have been tested. It should have been here and presented to this jury [to] take away all that issue about whether or not the shots were from the inside or the outside."

When Agent Scott was called to testify about the door, the trial court certified him as an expert in trajectory analysis in addition to firearms identification. Counsel for Defendant did not object to Agent Scott's certification as an expert. Defendant now complains that the door, in its damaged state, should not have been admitted into evidence.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides every defendant the right to a fair trial.[4] To facilitate this right, a

---

[3]Agent Scott had not examined the door prior to trial, in part because it was not sent to the TBI lab for examination.

[4]"As a general rule, . . . a trial lacks fundamental fairness where there are errors which call into question the reliability of the outcome." *Ferguson*, 2 S.W.3d at 914 n.3 (citing *Betts v. Brady*, 316 U.S. 455, 462 (1942); *Watkins v. State*, 393 S.W.2d 141, 144 (Tenn. 1965); *Lofton v. State*, 898 S.W.2d 246, 248 (Tenn. Crim. App. 1994)).

defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to guilt or relevant to punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Further, the prosecution has a duty to turn over exculpatory evidence that would raise a reasonable doubt about a defendant's guilt. *United States v. Agurs*, 427 U.S. 97, 110-11 (1976).

The State has a general duty to preserve all evidence subject to discovery and inspection as part of Tennessee Rule of Criminal Procedure 16. The case of *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999), cited by Defendant to support his argument, illustrates the procedure used by courts to examine situations in which the State fails to preserve evidence. In *Ferguson*, the defendant was arrested for driving under the influence ("DUI"). The videotape of various sobriety tests performed by the defendant was inadvertently recorded over before his trial. *Id.* at 914. The defendant appealed, arguing that the State violated his due process rights by failing to preserve the videotape.

The Tennessee Supreme Court has observed that "the due process required under the Tennessee Constitution [is] broader than the due process required under the United States Constitution" and rejected the "bad faith" analysis espoused by the United States Supreme Court in favor of "a balancing approach in which bad faith is but one of the factors to be considered in determining whether the lost or destroyed evidence will deprive a defendant of a fundamentally fair trial." *State v. Merriman*, 410 S.W.3d 779, 784-85 (Tenn. 2013) (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988) (holding that "[u]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law")). Our supreme court "observed that fundamental fairness, as an element of due process, requires a review of the entire record to evaluate the effect of the State's failure to preserve evidence." *Id.* at 784-85 (citing *Ferguson*, 2 S.W.3d at 914, 917).

Our state supreme court adopted a test for courts to use in determining whether the loss or destruction of evidence has deprived a defendant of a fair trial. *Ferguson*, 2 S.W.3d at 917. The first step is to determine whether there was any duty to preserve evidence:

> Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

*Id.* (quoting *California v. Trombetta*, 467 U.S. 479, 488-89 (1984)). The court explained that if the proof demonstrates the existence of a duty to preserve the evidence and demonstrates that the State failed in that duty, "the analysis moves to considerations of several factors which guide the decision regarding the consequences of the breach." *Id.* Those factors include: "(1) The degree of negligence involved; (2) The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and (3) The sufficiency of the other evidence used at trial to support the conviction." *Id.* If, after considering all the factors, the trial judge concludes that a trial without the missing evidence would not be fundamentally fair, the trial court "may then impose an appropriate remedy to protect the defendant's right to a fair trial, including, but not limited to, dismissing the charges or providing a jury instruction." *Merriman*, 410 S.W.3d at 785-86.

We review the trial court's decision concerning the fundamental fairness of a trial conducted without the "missing" evidence under a de novo standard of review. *Id.* at 791. If this Court concludes that the trial would be fundamentally unfair in the absence of the lost evidence, this Court will apply an abuse of discretion standard to review the appropriateness of the remedy imposed by the trial court. *Id.* at 792.

To begin our analysis, we look to whether the State had a duty to preserve the evidence. The evidence must have had, according to *Ferguson*, "an exculpatory value that was apparent before the evidence was destroyed." Additionally, the evidence has to be unobtainable by other "reasonably available means." 2 S.W.3d at 917 (quoting *Trombetta*, 467 U.S. at 488-89). In this case, it is unclear whether the door was exculpatory evidence which the State had a duty to preserve under *Ferguson*. Regardless of whether the State actually had a duty to preserve the evidence, the State undertook to preserve the door and failed to do so. Therefore, we will examine the three factors announced in *Ferguson* as if the State did have a duty to preserve the evidence in question.

Sometime prior to trial, the glass in the door became damaged, most likely during transportation due to improper packing and inadequate padding around the glass. However, it does not appear that the State was grossly negligent in its handling of the door, nor that the State intentionally damaged the door. Therefore, we determine the first *Ferguson* factor—the degree of negligence involved—weighs against Defendant.

The second factor—the significance of the destroyed evidence—also weighs against Defendant. There was ample secondary evidence separate and apart from the window in the door to diminish the significance of the damaged or missing glass. There were multiple bullet holes in the door itself, and the State took many photographs of the door, at least five of which were entered into evidence. Additionally, Agent Scott, who was certified by the

trial court as an expert in trajectory, was able to form an opinion on the trajectory of the bullets fired based on the glass that was remaining in the door at the time of trial. In his opinion, there was no question that the bullets were fired from the outside of the door. The door itself also had bullet holes that indicated that the shots were fired from the outside of the trailer. There was no other testimony or proof indicating that the victim possessed a weapon or fired shots from inside the trailer. Moreover, the victim's wounds were consistent with shots being fired from outside of the trailer. Finally, Defendant admitted in his statement that he fired from outside, through the door, at the victim.

The final *Ferguson* factor—the sufficiency of the remaining evidence—also weighs against Defendant. As discussed below, the evidence against Defendant was sufficient to support the conviction for first degree murder. Based on our evaluation of the three *Ferguson* factors, we conclude that a trial without the missing evidence would not be fundamentally unfair. Therefore, there is no need to determine whether the trial court should have imposed an appropriate remedy. Defendant is not entitled to relief on this issue.

*Sufficiency of the Evidence*

Lastly, Defendant contends that the evidence is insufficient to support the conviction for first degree murder. He insists that his conviction should be reduced to voluntary manslaughter because the facts "did not reveal any cold calculating plan to perpetrate a murder." Additionally, Defendant points to his own statement that he heard the victim was armed and thought he saw the victim "pulling a gun up." Defendant insists that the shooting was a reckless homicide or a voluntary manslaughter, not a first degree murder. The State disagrees.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003). As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for

those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

First degree murder is described as "[a] premeditated and intentional killing of another . . . ." T.C.A. § 39-13-202(a). Tennessee Code Annotated section 39-13-202(d) provides that:

> "[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

An intentional act requires that the person have the desire to engage in the conduct or cause the result. T.C.A. § 39-11-106(a)(18). Whether the evidence was sufficient depends entirely on whether the State was able to establish beyond a reasonable doubt the element of premeditation. *See State v. Sims*, 45 S.W.3d 1, 7 (Tenn. 2001); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). Whether premeditation is present is a question of fact for the jury, and it may be inferred from the circumstances surrounding the killing. *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006); *see also State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000); *State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998).

Premeditation may be proved by circumstantial evidence. *See, e .g.*, *State v. Brown*, 836 S.W.2d 530, 541-42 (Tenn. 1992). Our supreme court has identified a number of circumstances from which the jury may infer premeditation: (1) the use of a deadly weapon upon an unarmed victim; (2) the particular cruelty of the killing; (3) the defendant's threats or declarations of intent to kill; (4) the defendant's procurement of a weapon; (5) any preparations to conceal the crime undertaken before the crime is committed; (6) destruction or secretion of evidence of the killing; and (7) a defendant's calmness immediately after the killing. *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *Pike*, 978 S.W.2d at 914-15. This list, however, is not exhaustive and serves only to demonstrate that premeditation may be established by any evidence from which the jury may infer that the killing was done "after the exercise of reflection and judgment." T.C.A. § 39-13-202(d); *see Pike*, 978 S.W.2d at

914-15; *Bland*, 958 S.W.2d at 660. One well-regarded treatise states that premeditation may be inferred from events that occur before and at the time of the killing:

> Three categories of evidence are important for [the] purpose [of inferring premeditation]: (1) facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing, that is, planning activity; (2) facts about the defendant's prior relationship and conduct with the victim from which motive may be inferred; and (3) facts about the nature of the killing from which it may be inferred that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design.

2 Wayne R. LaFave, *Substantive Criminal Law* § 14.7(a) (2d ed. 2003).

We conclude that the evidence presented was sufficient to support the jury's findings that premeditation existed. The evidence presented at trial showed that Defendant engaged in repeated harassment of his ex-wife and was unhappy with and troubled by her new relationship with the victim. Defendant spied on the victim and his ex-wife and made threats against their lives prior to the incident. On the night of the victim's death, Defendant removed the lightbulb from the porch lamp in order to prevent himself from being discovered. When the victim appeared to investigate why the dog was barking and to see why the porch light was not working, Defendant shot him through the door of the trailer several times. Mrs. Keplinger hysterically called 911 and reported that Defendant was most likely the shooter. After he was apprehended, Defendant himself confirmed that he was the shooter. He led the police to where he had hidden the murder weapon. Testing confirmed that this was indeed the gun that murdered the victim. The jury heard the evidence and chose to disregard Defendant's theory that the crime was born out of passion. It was in their prerogative to do so. From this evidence, we conclude that a reasonable jury could find premeditation. Consequently, Defendant's conviction for first degree murder is affirmed.

*Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed.

_____

TIMOTHY L. EASTER, JUDGE